NOTICE

Decision filed 11/16/20. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2020 IL App (5th) 200175-U

NO. 5-20-0175

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| BETHANY S. STOCK, | ) | Clinton County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| and | ) | No. 17-D-27 |
| | ) | |
| ROBERT W. STOCK, | ) | Honorable |
| | ) | Allan F. Lolie Jr., |
| Respondent-Appellant. | ) | Judge, presiding. |

_____

JUSTICE MOORE delivered the judgment of the court.
Presiding Justice Welch and Justice Barberis concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The circuit court's judgment allocating the parental responsibilities of the parties is affirmed where the judgment is not against the manifest weight of the evidence.

¶ 2    The respondent, Robert W. Stock, appeals the June 10, 2020, judgment of the circuit court of Clinton County which allocated the parental responsibilities of Robert and the petitioner, Bethany S. Stock, as to their minor child, A.S., born April 4, 2015. For the following reasons, we affirm.

1

¶ 3                                    I. BACKGROUND

¶ 4                                 A. Pretrial Proceedings

¶ 5     Because the circuit court, at the bench trial, took judicial notice of the pretrial proceedings, we discuss them at length. Bethany filed a petition for dissolution of the marriage on March 9, 2017, and Robert filed a counterpetition thereafter. In their respective petitions, each party requested that the circuit court allocate to them the majority of parenting time with A.S. pursuant to section 602.7 of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/602.7 (West 2016)). Bethany also requested sole decision-making responsibilities pursuant to section 602.5 of the Act (*id.* § 602.5), and that Robert's parental responsibilities be restricted pursuant to section 603.10 of the Act (*id.* § 603.10). In his counterpetition, Robert requested that he be granted "significant" decision-making responsibilities for A.S.

¶ 6     On June 27, 2017, Robert filed an emergency petition for a temporary order allocating parenting time to him, claiming that Bethany was refusing to allow him to spend time with A.S. after repeated requests. On July 24, 2017, Bethany filed a motion requesting that Robert be required to submit to drug testing, alleging that she believed that Robert was using illegal substances and medications not prescribed to him, as well as abusing medications that had been prescribed to him. Bethany also requested that Robert be required to submit to a psychological evaluation, alleging he had demonstrated varying degrees of mental instability, prior to and after the parties separated.

¶ 7     On July 31, 2017, the circuit court entered an order requiring both parties to submit to drug testing and a psychological evaluation to be performed by Dr. Robert Clipper. The circuit court also entered a temporary order, pursuant to section 603.5 of the Act (750 ILCS 5/603.5 (West 2016)), allocating parenting time to Robert every Wednesday evening from 4 p.m. until 7 p.m. and

2

every other weekend from Friday at 6 p.m. until Sunday at 6 p.m. The circuit court appointed Rosemary Berkemann as guardian *ad litem* (GAL) for A.S.

¶ 8    On January 17, 2018, the circuit court ordered both parties to repeat drug testing upon the motion of the GAL, who reported that Robert tested positive for amphetamines in July of 2017. The circuit court ordered that if either party tested positive for any drug, other than Adderall in the case of Robert, that party would be required to continue to submit to drug screenings at least two days prior to their parenting time with A.S. Following the entry of this order, agreed orders were entered on February 7, 2018, February 9, 2018, February 21, 2018, February 27, 2018, March 5, 2018, March 12, 2018, March 15, 2018, and March 26, 2018, providing that Robert would not have his parenting time with A.S. on these dates. According to an interim GAL report dated March 15, 2018, Robert had not seen A.S. since January 28, 2018, by agreement of the parties because Robert had tested positive on "various drug and alcohol tests." According to an exhibit to that report, Robert tested positive for marijuana, methamphetamines, amphetamines, and steroids during this period.

¶ 9    While the record is unclear as to what point in time the circuit court, the GAL, and Robert were made aware, it is undisputed that Bethany moved with A.S. to Texas sometime in March of 2018. On April 13, 2018, the circuit court entered an order modifying the temporary allocation of parenting time to Robert. The order provided that Robert's temporary parenting time would be suspended pursuant to an order of protection that had been entered, except that Robert could have Facetime with A.S. on Mondays and Wednesdays at 5:30 p.m.  A docket entry from that date explains that the circuit court would dismiss the order of protection once Robert began drug treatment counseling, at which time it would order supervised visits conditioned on Robert's weekly attendance in a drug counseling program.

3

¶ 10    On April 27, 2018, the parties entered into a stipulated temporary order allowing Robert to have unsupervised parenting time with A.S. contingent upon him actively remaining in a treatment program at Gateway Drug and Alcohol Treatment Center (Gateway) and submitting to regular drug testing with negative results. The stipulated temporary order stated that Robert was to exercise that parenting time on Saturday, April 28, 2018, from 3 p.m. to 6 p.m. and Sunday, April 29, 2018, from 3 p.m. to 6 p.m. The stipulated temporary order also provided that Robert would be able to communicate with A.S. three days per week by Facetime.

¶ 11    On May 21, 2018, a temporary order was entered allowing Robert to have supervised parenting time with A.S. four times that week, for three to four hours each time. The order was contingent upon Robert's continued attendance at Gateway with negative drug screenings. The order also provided that if Robert successfully completed the eight-week outpatient drug program at Gateway, he would be granted three unsupervised visits with A.S. on the weekend of June 17, 2018.

¶ 12    On June 20, 2018, the circuit court entered an order granting Robert unsupervised parenting time with A.S. on one weekend in June, July, and August of 2018. The order provided that the parties were to meet at Bethany's parents' home in Hot Springs, Arkansas, for the exchange unless Bethany was in Illinois, in which case the parties were to meet at the McDonald's in Mascoutah. On September 5, 2018, the circuit court entered another temporary order allowing for similar monthly parenting time in September, October, November, and December of 2018. The order contained a scrivener's error in that it provided that the parties should meet on September 12, 2019, at the McDonald's in Hot Springs, Arkansas, to return A.S., rather than on September 12, 2018.

¶ 13    On September 13, 2018, the circuit court entered an order for a rule to show cause why Robert should not be held in indirect civil contempt of court for refusing to allow Bethany Facetime

4

communication with A.S. during his September visit, failing to deliver A.S. to Bethany on September 12, 2018, and failing to respond to the GAL's attempts to contact him regarding returning A.S. to Bethany. A hearing on the rule to show cause was set for September 27, 2018. On September 20, 2018, Robert filed an emergency petition for immediate return of the minor child to the State of Illinois, and for a temporary restraining order (TRO) and preliminary injunction. Robert filed a notice of hearing for that motion to be heard on September 27, 2018, as well.

¶ 14     At a hearing on all pending matters on September 27, 2018, Robert testified that he did not return A.S. to Bethany on September 12, 2018, because he saw the scrivener's error in the order as "an opportunity in which to have additional time with A.S," because she had been wrongfully taken from him. The circuit court found Robert to be in indirect civil contempt of court for failing to return A.S. and ordered him to purge the contempt by following all future court orders and by submitting to another psychological evaluation. The circuit court entered an order providing that Robert was to have no further in-person parenting time until further order of the court, but that electronic contact was still permitted. The circuit court then took up a host of financial issues between the parties, and the parties agreed to take up the motion regarding returning A.S. to Illinois at the next hearing that was set on pending issues for October 15, 2018.

¶ 15     The record does not contain a transcript of the proceedings held on October 15, 2018, but an order was entered resolving many temporary financial issues between the parties on that date. However, no order was entered on Robert's emergency motion to require Bethany to return A.S. to Illinois. Rather, the order provided for unsupervised parenting time for Robert from October 15, 2018, to October 20, 2018, with the parties to exchange A.S. in Hot Springs, Arkansas. In addition, Facetime communication was ordered three times a week.

5

¶ 16    On January 31, 2019, the circuit court entered an order granting Robert unsupervised, in-person parenting time from February 2, 2019, until February 16, 2019, and March 2, 2019, until March 16, 2019. On or about February 15, 2019, Robert made a post on Facebook alleging that A.S. had been sexually abused while in Bethany's care. On February 16, 2019, Robert did not return A.S. to Hot Springs, Arkansas, as ordered. The record reflects that Bethany obtained an emergency order of protection in St. Clair County to secure the return of A.S. from that visit. Following this incident, Bethany filed, *inter alia*, a petition for a rule to show cause why Robert should not be held in contempt of court for failing to return A.S. to Bethany as ordered.

¶ 17    On March 1, 2019, the circuit court suspended all in-person parenting time for Robert, and on March 4, 2019, the circuit court reaffirmed that ruling, stating in a docket entry that "the court fears that [Robert] will not return A[.S.]." Facetime communication was ordered to continue at that time. Also on that date, Robert's fifth attorney filed a motion to withdraw as his counsel. Proceedings on the rule to show cause were continued while Robert sought substitute counsel, who entered an appearance on his behalf. On April 29, 2019, Robert filed another petition for a TRO and/or a preliminary injunction, again requesting that the circuit court require Bethany to move back to Illinois with A.S. However, Robert's sixth attorney, who filed that motion on his behalf, filed a motion to withdraw as his counsel soon after, further delaying proceedings on Robert's petition, as well as the rule to show cause. On May 13, 2019, Robert failed to appear at a hearing, resulting in a second rule to show cause.

¶ 18    At a hearing on pending matters on June 27, 2019, Robert testified that A.S. told him several times that she had been sexually abused. He posted the allegations on Facebook because "there is only one way to end abuse that's not taken seriously, and unfortunately that is ensuring that everyone you know knows." Robert testified that he took A.S. to Children's Hospital during

6

his February parenting time to have a sexual assault examination. Children's Hospital did not find any evidence of abuse, and a Department of Children and Family Services (DCFS) investigation found the allegation was unfounded. During Robert's testimony, the circuit court told him several times to slow down, because he was speaking so fast. Robert admitted to making Facebook posts accusing the court, his attorney, the GAL, and others of being involved in a conspiracy against him. He also admitted to posting on Facebook at different times that he was under surveillance by local police and by Bethany's family. Following the hearing, the circuit court entered an order requiring that both parties submit to an updated psychological evaluation by Dr. Clipper and drug testing. The circuit court also found Robert to be in indirect civil contempt based on his failure to abide by court orders regarding temporary financial issues between the parties.

¶ 19    The circuit court held a hearing on Robert's petition for a TRO and/or preliminary injunction on August 22, 2019. Julie Weber testified that she is a licensed professional counselor who has been providing counseling services to A.S. since November of 2017. Julie testified that A.S. loves Texas and that consistency in the life of A.S. is very important for her. According to Julie, since the incident occurring in February of 2019, A.S. had become fearful of Robert not returning her after parenting time. Julie emphasized the importance of reestablishing a relationship between Robert and A.S. cautiously, beginning with short-term supervised parenting time.

¶ 20    Robert testified that he did not return A.S. after a visit on February 16, 2019. A Facebook video with over two thousand views was admitted into evidence over Robert's objection. The video depicted Robert in a standoff with the St. Clair County Sheriff's Department as he narrated and videotaped the event live on Facebook. At one point during the video, an officer asks for proof that A.S. is safe, at which time Robert brings A.S. out onto the roof of his home. A.S. places her hand over Robert's mouth as he shouts negative comments about Bethany down at the officers. A

7

series of Facebook posts made by Robert were also admitted into evidence over his objection. These posts depict Robert making various allegations of conspiracy against the court, the attorneys, and others, as well as allegations that A.S. had been sexually abused by members of Bethany's family. Several of the posts included pictures of A.S.

¶ 21 Bethany testified that there was a cycle of domestic abuse between her and Robert dating back prior to their marriage. She testified that she moved to Texas out of fear for her safety. According to Bethany, Robert had been indicted on multiple felonies in Texas for violating an order of protection, witness tampering, and possession of a controlled substance. He was required to wear an ankle monitor and to stay out of the state of Texas without a court order.

¶ 22 Following the presentation of evidence and argument, the circuit court denied Robert's petition for a TRO, noting that all issues, including Bethany's relocation, the allocation of parental responsibilities, and parenting time, were scheduled to be heard on the merits at an evidentiary hearing beginning on November 5, 2019. In the meantime, the circuit court ordered that Robert have supervised parenting time with A.S. immediately following the hearing on the TRO, as well as over Labor Day weekend and Columbus Day weekend. On August 26, 2019, Robert filed a petition for interlocutory review of the circuit court's order, pursuant to Illinois Supreme Court Rule 307(d) (eff. Nov. 1, 2017). On September 3, 2019, this court entered an order affirming the circuit court's ruling. *In re Marriage of Stock*, 2019 IL App (5th) 190364-U. This court held that Robert could not establish the elements of a TRO in large part because A.S. had been in Texas for almost a year and a half before Robert brought his petition before the court for a hearing. *Id.* ¶ 15.

¶ 23 A docket entry dated August 30, 2019, states that the parties had agreed to supervised parenting time on that weekend and would arrange for a visit in Texas on September 11, 2019. The docket entry also states that the parties would arrange for supervised parenting time in October

8

as well. On November 1, 2019, the circuit court ordered Bethany to bring A.S. to Illinois during the bench trial set to begin on November 18, 2019, "so that [Robert] may have as much supervised parenting time during those two days as possible." On November 14, 2019, the circuit court entered an order allowing Robert supervised parenting time for six hours on November 15, 16, and 17, 2019. Similar orders were entered allowing Robert supervised parenting time throughout the duration of the trial, but these visits were not without conflict, as will be discussed below.

¶ 24                    B. Bench Trial—November 18, 2019

¶ 25    The bench trial on issues of the parties' parental responsibility and parenting time commenced on November 18, 2019. The circuit court took judicial notice of all prior proceedings, and the following additional relevant evidence was introduced by the parties.

¶ 26                    1. *Dr. Clipper's Reports*

¶ 27    The circuit court admitted into evidence three "Family Evaluation Reports" from Dr. Robert Clipper, prepared pursuant to section 604.10(b) of the Act (750 ILCS 5/604.10(b) (West 2018)). The first report is dated January 13, 2018, which is near the beginning of these proceedings. Dr. Clipper's January 13, 2018, report was based on his interview and psychological testing of the parties and the documentary evidence provided by both parties and the GAL. Dr. Clipper noted that Bethany has some dependent tendencies and tends to see her merit or worth defined by the perception of others. Robert, on the other hand, requires a good deal of attention, and seems to crave exaggerated levels of stimulation or excitement but then becomes quickly bored "when said activities or attention do not meet his distorted needs." In addition, Dr. Clipper opined that Robert's capacity to empathize for the feelings and needs of others tends to be short-lived or self-oriented, based on whether the effort serves his needs.

9

¶ 28    After recounting his interviews with the parties and others who are most familiar with them, Dr. Clipper opined that, due to the tension that exists anytime the parties encounter each other, the parties should exchange A.S. at the Children's First Family Exchange Center. Given the age of A.S., Dr. Clipper recommended that she spend dominant time with Bethany, who has been A.S.'s primary attachment figure. He stated that "a 50/50 arrangement is not mindful of A[.S.]'s current emotional needs." He recommended that allocation of parental responsibility be designed with Robert having parenting time from Friday afternoon until Sunday evening on an alternating weekly basis and from Tuesday or Wednesday afternoon until the following evening. He recommended that the parties have equal involvement in decisions such as education, medical treatment, religion, and extracurricular activities. Dr. Clipper concluded at that time that "Rob[ert] and Bethany must figure out how to move forward and not absorb themselves in constant bickering, conflicts[,] or ways to annoy the other."

¶ 29    Dr. Clipper's second report, dated October 16, 2018, was made after he met with Bethany and Robert again, reviewed documents by the GAL, and reviewed records related to Bethany's progress in therapy, Robert's progress in outpatient drug treatment at Gateway, and communications between the parties. The report acknowledged that since the time of the January 31, 2018, report, Robert's parenting time was suspended for about three months, during which time Bethany moved with A.S. to Texas. He expressed doubt as to the sincerity of Bethany's motivations for making this move. Dr. Clipper stated in this report that he had not found significant changes in the parties' behavior to warrant change to his prior recommendations as to parenting time. Dr. Clipper did recognize that if Bethany were permitted to stay in Texas with A.S., parenting time for Robert would be less frequent but longer in duration. As to decision-making, because of the conflicts between the parties, Dr. Clipper recommended Bethany be given responsibility for

10

major medical and educational decisions and Robert be given responsibility for primary decisions as to religion and extracurricular activities. Finally, Dr. Clipper recommended that both parties "seek a mature, solid, skilled therapist to carefully examine their decisions and life patterns."

¶ 30    Dr. Clipper's third report, dated August 11, 2019, was made after he conducted a follow-up assessment on Bethany, Robert, and A.S. Dr. Clipper also interviewed Bethany's therapist and viewed the video of Robert's standoff with police in September of 2018, as well as a video recording of Robert talking to A.S. in the car, questioning her about being hurt or abused and whether she was afraid of returning to Bethany. After interviewing Robert, his impressions of Robert's reasoning for alleging that A.S. had been sexually abused are as follows:

"My inquiry as to what [Robert] felt was evidence of abuse was based on self-created evidence as to what constituted signs of sexual abuse. It was not clear when said events occurred, but [Robert] contends he instructed A[.S.] about not allowing people to touch her 'no-no place,' and that A[.S.] sitting spread legged in a tub and holding toys in front of her vaginal area constituted signs of sexual abuse. A[.S.]'s discomfort with defecation was described as evidence, with no notion that the child may have been constipated and the procedure of cleaning her as if she were an infant, i.e., lying on her back, may have been a source of discomfort. The singling out of 'Uncle Brad' as the perpetrator was unclear and how, where, and when this occurred is similarly unclear. Rob[ert] both denied and then declared that he revealed his concerns to [A.S.'s counselor], considering she has a trusted relationship with A[.S.,] and was a key person to engage A[.S.] However, [A.S.'s counselor] indicated she did question A[.S.] about her treatment by anyone in her life and A[.S.] did not declare being abused in any fashion by anyone. DCFS and Children's Hospital did not learn any information that caused them to look further or indicate concern

11

that A[.S.] was being exploited or abused. Rob[ert] declared the DCFS Child Advocacy Center interview as inadequate and because of the presence of a Sheriff Department [d]eputy, this was indicative of a political hatchet job on him for supporting the Republican party. There was an investigation by the Texas Family Services and they found no evidence of abuse. However Rob[ert] was adamant about the abuse thus justifying him not returning A[.S.] after the February 2019 visit. It was during this visit he decided to host his Shakespearian style production on his balcony, which at times, was with A[.S.] in his arms. It was notable that while he's proclaiming to the deputies that Bethany is allowing A[.S.] to be abused, A[.S.] puts her hands over his mouth to stop him twice. A[.S.]'s awareness and discomfort with Rob[ert]'s criticism and use of pejorative terms was revealed at other times by A[.S.] to [A.S.'s counselor], yet it is not clear if Rob[ert] appreciates the effects of his own actions."

¶ 31    Dr. Clipper concluded that Robert's actions "are fraught with narcissistic patterns of a person who portrays him[self] as the salt of the earth and conscientious of others, yet [his] actions are steeped in his need for attention, praise, and [a] self-absorbed absence of self-awareness." Dr. Clipper expressed concern about "how future visitation could possibly work." He expressed doubt that Robert is the kind of person who is capable of engaging in sincere therapeutic work, but recommended that it be a requirement that he engage in therapy with someone who has a lot of experience dealing with personality or character deficits. He recommended that, until Robert establishes such a therapeutic relationship with a professional, and his evolution in therapy has been shown, parenting time be supervised. Dr. Clipper declined to make a recommendation on whether Bethany should be ordered to move back to Illinois.

¶ 32                              2. *Hugh Fitz*

¶ 33    Hugh Fitz testified he is a pastor at St. John United Church of Christ, where the parties attended during the marriage. He testified regarding the acrimony between the parties during their marriage. He testified that Bethany requested that he act as a supervisor of visits between Robert and A.S. in mid-2018, but Robert refused. He also testified that Robert sent him a series of angry texts during that time.

¶ 34                           3. *William Massman*

¶ 35    William Massman testified that he is the owner of Kids First, a business that provides supervision for parenting time when it is required. He supervised visits between Robert and A.S. beginning in the spring of 2018. He testified the arrangement worked well until October 13, 2019, when during a visit to Grant's Farm in St. Louis, Robert became irritated after Mr. Massman told him that the GAL was planning to meet with Bethany immediately prior to their return of A.S. to Bethany. Mr. Massman testified that Robert was intimidating and aggressive for the remainder of the visit, disparaging Bethany in A.S.'s presence. Mr. Massman refused to supervise any further visits with Robert.

¶ 36                              4. *Julie Weber*

¶ 37    Julie Weber testified she is a licensed professional counselor and early childhood clinician. She has been A.S.'s counselor for over two years, having met with A.S. in person for over 30 sessions, and over Facetime from Texas. She testified that she has observed interactions between A.S. and Bethany, which have always been positive. She also had Robert come into her office with A.S. on two occasions and recalled that Robert broke down sobbing in front of A.S. and had to be redirected. She did observe that Robert and A.S. do have a bond and an appropriate relationship.

¶ 38    Ms. Weber testified that the Facebook posts Robert has made regarding A.S. were inappropriate and an invasion of A.S.'s privacy. She never found any sign that A.S. had been abused. She testified that A.S. is happy and well-adjusted in Texas. Ms. Weber recounted times in therapy when A.S. would get upset as she repeated things that Robert has said to her about Bethany. She also testified to the negative impact that the incidents in which Robert refused to return A.S. had on her, and opined that a move back to Illinois would be stressful for A.S. She recommended that Robert be allowed supervised parenting time with A.S. every other month and Facetime visits.

¶ 39    On cross-examination, Ms. Weber testified that since she has been in Texas, A.S. moved between two preschools and four residences. She agreed that A.S. needs a consistent parenting time schedule with Robert, to begin with no longer than four hours at a time due to A.S.'s trepidation that Robert will not return her after the parenting time. Ms. Weber acknowledged that A.S. misses Robert and testified that the Facetime visits are getting better as A.S. grows.

¶ 40                                    5. *Trista Dall*

¶ 41    Trista Dall testified that she was in a romantic relationship with Robert from 2005 until 2008. During that time, she had her daughters, aged five and seven, with her every other week. She testified that during their relationship, Robert abused alcohol and abused her, recounting instances of physical restraint, punching, the throwing of objects, and sexual abuse. She also testified that Robert used marijuana and cocaine during their relationship. On cross-examination, Ms. Dall testified regarding positive interactions Robert had with her children.

¶ 42                                    6. *Bethany Stock*

¶ 43    Bethany Stock described instances of domestic violence on the part of Robert prior to and during the marriage. She testified that she let Robert coax her into cocaine use during the marriage, and described instances where Robert sexually exploited her. She testified that she participates in

14

counseling to manage her anxiety, which she attributes to the trauma of her relationship with Robert. She stated that she began taking Xanax to manage her anxiety during the marriage, but she does not need to take it when she is in Texas.

¶ 44   Bethany explained that she moved with A.S. to Texas in March of 2018. At this time, Robert's parenting time with A.S. was suspended after he failed several drug tests and refused to agree to supervised parenting time. She moved to Texas because she feared for her safety, and she found her only job opportunity there. Her first job in Texas was as an interior designer at Prime Home Staging, but she had since started her own business. She first resided with her sister until May of 2018. She then moved to her boss's empty condominium while waiting for her apartment to be ready. She moved to her own apartment in August of 2018 but moved out in April of 2019 after Robert put her address on Facebook while making allegations that A.S. had been abused. She has been in her new apartment since April of 2019 and is trying to keep her address secret from Robert.

¶ 45   Bethany testified that A.S. attended preschool five days per week at Primrose School in Texas. She loves school and participates in dance and gymnastics there. She transferred from one Primrose location to another in May of 2019 to be closer to the new apartment. Bethany took A.S. on group playdates with her friends from the prior school. Bethany testified that she plans to put A.S. in a Christian school in Texas when she starts kindergarten. A.S. can use Facetime to contact Robert and Bethany encourages A.S. to do this. They initiate Facetime approximately three times per week. She also cooperates with Robert and tries to help arrange the supervised parenting time to his liking. Following Bethany's direct examination, the circuit court recessed for the day.

¶ 46                    C. Bench Trial—November 19, 2019

¶ 47    The bench trial continued November 19, 2019, and the circuit court noted that Robert was not present. His attorney could not contact him, and the trial continued in his absence. The circuit court noted its concern for Robert's mental stability, and suspended Robert's supervised parenting time until such time as Robert explained his absence.

¶ 48                    1. *Cross-Examination of Bethany Stock*

¶ 49    On cross-examination, Bethany testified that her first attorney advised her that she did not need to ask permission from the court to relocate with A.S. to Texas because there was no parenting plan in place. She also testified that she had been in two romantic relationships in Texas. She admitted that one of the ex-boyfriends made a report to the FBI that she was trying to have Robert killed but denied that this was true. No charges have been filed against her based on any such allegation.

¶ 50                    2. *GAL Rosemary Berkemann*

¶ 51    The November 16, 2019, GAL report from Rosemary Berkemann was admitted into evidence. Based on the myriad of information she had gathered, Ms. Berkemann reported her findings and recommendations in detail. She provided the court with a detailed analysis of the best interest factors listed in section 602.7 of the Act (750 ILCS 5/602.7 (West 2018)). Ms. Berkemann emphasized that the parties have no ability to cooperate with each other in making joint decisions regarding A.S. According to Ms. Berkemann, since her appointment, the parties expected her to "referee" almost every exchange of A.S. between them. She has been copied on practically every communication between them, and each of the parties individually, or through their attorneys, communicated with her on almost a daily basis throughout these proceedings, including evenings, weekends, and holidays.

¶ 52 Based on her analysis of the best interest factors, the GAL recommended that Bethany continue to have the majority of parenting time, but that she be required to return to Illinois with A.S. so that Robert could have frequent contact with her. The GAL reasoned as follows:

"Robert has very strong desires to have a good father-daughter relationship with A[.S.] Without a doubt, it is in A[.S.'s] best interest to have a healthy relationship with both parents. The only true way for Robert *** to have a healthy relationship with A[.S.] would be to have frequent contact with A[.S.] due to her young age. History in this case reveals that all attempts to accomplish parenting time for Rob[ert] have primarily failed or involved much controversy in scheduling and implementing. Even for Rob[ert] to have monthly parenting time with A[.S.] causes Beth[any] and A[.S.] to be gone for at least a week at a time. It is not in A[.S.]'s best interest to miss a week of school every month. Moreover, to attempt to accomplish frequent contact from Texas would require A[.S.] to do extensive traveling back and forth between Illinois and Texas which is not in A[.S.]'s best interest. I do not believe anyone is comfortable having A[.S.] fly back and forth at this early age; driving will not only be exhausting for all involved but non-productive as more time will be spent on the road in transit than actual time spent with Rob[ert] ***. Simply stated, there is absolutely not enough cooperation between the parties to truly place A[.S.]'s needs before his/her own desires. Undoubtedly, on more than one occasion throughout the pendency of these proceedings, the parties have each utilized A[.S.] as a sword to hurt the other parent and not acted in A[.S.]'s best interests when attempting to schedule parenting time, implement court-ordered parenting time, etc. Most of A[.S.]'s family on [Bethany's] side and [Robert's] side is now located in Illinois. Allowing Beth[any] to continue moving A[.S.] from place to place in Texas on a moment's notice each time she believes that

17

Rob[ert] may have knowledge of her location is definitely not in A[.S.]'s best interest and that behavior needs to end."

¶ 53    The GAL recommended that Robert have supervised parenting time with A.S. every Wednesday from 5 p.m. to 7 p.m. and on alternating weekends as follows: (1) Fridays from 5 p.m. to 8 p.m.; (2) Saturdays from 12 p.m. to 6 p.m.; and (3) Sundays from 12 p.m. to 6 p.m. Conditioned upon Robert responsibly dealing with the criminal charges lodged against him in Texas and undergoing counseling, the GAL recommended that by March 6, 2020, Robert begin having unsupervised parenting time with A.S. every other weekend from 6 p.m. on Fridays until 6 p.m. on Sundays, and every Wednesday from 5 p.m. until 7:30 p.m.

¶ 54    According to the GAL, Bethany should be awarded the decision-making responsibilities for health, education, religion, and extracurricular activities. Once the order of protection expired, Robert properly dealt with the criminal charges against him in Texas, and the parenting time is returned to unrestricted, the GAL recommended that the decision-making responsibilities be allocated to both parties.

¶ 55    The GAL testified that A.S. is a happy child that has adapted well to the constant changes in her life. The GAL is concerned that A.S.'s life in Texas has been unstable based on Bethany's three moves between homes and the fact that A.S. had to switch preschools, and what she characterized as scattered attendance in school. She also questioned Bethany's support system in Texas, pointing out that Bethany had been estranged from her sister who she initially lived with in Texas. She cited throughout her report numerous instances where she felt that Bethany was less than forthright with her about her relationship with her sister and other matters concerning her activities in Texas. The GAL also voiced concern in detail in her report about Bethany's two

18

romantic relationships since being in Texas and how those relationships impacted A.S.'s sense of stability. On cross-examination, the GAL admitted she is intimidated by Robert.

¶ 56                                    3. *Tammy Berg-Neumann*

¶ 57    Tammy Berg-Neumann testified that she owns and operates Precious Cargo Transport of Hillsboro, Missouri. She was hired to supervise Robert's parenting time with A.S. and, at the time of her testimony, had supervised his four visits with A.S. that had occurred that month. Ms. Berg-Neumann testified that A.S. was always happy to see Robert and remained content throughout the visits. She reported that Robert was always respectful to her during the visits, and that the exchanges went well. Ms. Berg-Neumann recounted an instance where they were running slightly late for an exchange, and Bethany became frantic. Ms. Berg-Neumann opined that a detailed agreement regarding the expectations for the exchange and visit was needed to ensure the process was peaceful.

¶ 58                                     4. *Donald Hubert*

¶ 59    Donald Hubert testified that he worked with Robert at Robert's father's company, Stock Transport, for many years. Mr. Hubert stated that during Robert's relationship with Trista Dall, she indicated to him that Robert treated her kids well.

¶ 60             D. Interim Proceedings: December 2019-February 2020

¶ 61    Following Mr. Hubert's testimony, the circuit court adjourned the proceedings, setting the remainder of the bench trial for January of 2020. The circuit court again expressed concern at Robert's absence from trial, stating:

> "I'm not going to order any visits until I find out what's going on with [Robert], why he's not here, if he's in some kind of traumatic situation or what have you. This is highly irregular as much time [and] effort that all of you have put in this case, as much money that

19

has been expended in this case. I've never seen a litigant not appear in a case involving parenting time where they were actively involved, at the very least financially, by hiring seven lawyers. So that concerns me that he might be in mental distress or something. So the visits have been arranged through today. There will be no further visits without some information provided by [Robert's counsel] to the [c]ourt."

¶ 62    On December 5, 2019, the circuit court noted in a docket entry that the parties would try to coordinate a December visit for Robert. The docket entry also states, "the court was advised that there was an emergency [order of protection] out of Missouri against [Robert] relating to his girlfriend's children." The parties confirmed that the bench trial would continue on January 13, 2020.

¶ 63    On January 13, 2020, the circuit court vacated the bench trial date due to Bethany's counsel having car trouble. The circuit court reset the bench trial for March 9 and 10, 2020. The circuit court set forth specific times for Robert to have supervised parenting time that evening from 4:30 p.m. to 8:30 p.m., as well as on January 22, 2020, from 6 p.m. to 8 p.m. at a Chuck E. Cheese in Texas. The circuit court ordered a conference call for January 24, 2020, to discuss February parenting time for Robert. Both parties were directed to have no contact with any third party about the case other than their attorneys and to solely communicate with each other through an application called "My Family Wizard."

¶ 64    On February 3, 2020, the circuit court ordered supervised parenting time for Robert for the weekend of February 15, 2020, and the weekend of March 7, 2020, from 10 a.m. to 6 p.m. on each Saturday and Sunday. The circuit court ordered that all exchanges occur inside the Noodles & Co. at the South St. Louis County Shopping Center in St. Louis. The circuit court ordered that Robert remain in his vehicle or the vehicle being operated by Precious Cargo and that the Precious Cargo

representative meet Bethany inside the Noodles & Co. to either pick up or drop off A.S. The order contained a list of places that Bethany could not be so as not to interfere with Robert and A.S. visiting the major St. Louis attractions. Robert was ordered to pay for Bethany and A.S. to fly to Illinois for Robert's February parenting time.

¶ 65                                    E. Bench Trial March 9, 2020

¶ 66                                    1. *Heath Herndon*

¶ 67    Heath Herndon testified that he dated Bethany in Texas from December of 2018 until March of 2019. He testified that Bethany and A.S. had a "strained" relationship and characterized Bethany as "heavy-handed." However, upon further questioning, Mr. Herndon seemed unable to explain exactly what he meant, but testified definitively that Bethany did not abuse A.S. He described Bethany as "short-tempered," and stated that they had some volatile interactions over the course of their short relationship. Mr. Herndon testified that Bethany told him Robert abused A.S. and toward the end of his relationship with Bethany, he contacted Robert to find out his side of the story.

¶ 68    Mr. Herndon testified that Bethany told him, in January of 2019, that "Rob[ert] needs to die," and asked if he knew anyone that would "take care of it." He testified that he and Bethany had sex in the same room with A.S. while she was sleeping and that Bethany drank every day, and sometimes "to excess." On cross-examination, Mr. Herndon confirmed that he had just been released for felony driving while intoxicated in Texas.

¶ 69                                    2. *GAL Supplemental Report and Testimony*

¶ 70    An extensive supplemental GAL report dated March 8, 2020, was admitted into evidence. The GAL recounted a detailed summary of two plenary orders of protection that were then in effect against Robert in Illinois, as well as one that had been put into effect in Texas. According to court

documents reviewed by the GAL, Eric Johnson, the ex-husband of Robert's fiancée, Kim Dimicelli, filed a petition for an order of protection in St. Louis County on November 22, 2019, (three days after Robert and Ms. Dimicelli failed to appear at the November 19, 2019, hearing), alleging that Robert had knowingly caused or attempted to cause physical harm to Mr. Johnson and Mr. Dimicelli's two children, aged five and nine. The St. Louis County court had granted an emergency order of protection, and a plenary order was entered by agreement on December 13, 2019.

¶ 71    The GAL reported that her investigation had revealed at least one occasion, the weekend of December 21 and 22, 2019, in which Bethany and A.S. spent time with Eric Johnson. According to the GAL, just a few days prior, on December 19, 2019, Mr. Johnson submitted to a hair follicle drug test pursuant to court order and said test confirmed his illegal use of cocaine, and the mixing of alcohol with cocaine. Moreover, the GAL expressed concern that Mr. Johnson purportedly has a history of physically abusing his former wife and Robert's fiancée, Kim Dimicelli, having been arrested on June 11, 2016, with domestic assault for choking Ms. Dimicelli. The GAL questioned Bethany's decision to have A.S. in Mr. Johnson's presence.

¶ 72    The GAL reported that on March 4, 2019, the previously entered plenary order of protection that Bethany had against Robert in Illinois was extended until March 4, 2022. In addition, on May 16, 2019, Robert appeared in Texas on charges of violation of a protective order, possession of a controlled substance, and tampering with a witness based on an incident where Robert appeared at a courthouse where Bethany was set to testify against Heath Herndon. Robert was ultimately convicted of violation of a protective order, and a Texas protective order was entered against him and in favor of Bethany in Texas as well.

22

¶ 73    In her supplemental report, the GAL laid out the factors a court must consider in determining whether to modify a parenting plan or allocation judgment based on a relocation pursuant to section 609.2(g) of the Act (750 ILCS 5/609.2(g) (West 2018)). Based on her analysis of these factors, the GAL persisted in her recommendation that Bethany relocate with A.S. back to Illinois. She continued to recommend that Bethany be awarded the majority of parenting time, and that Robert's parenting time be supervised until the court determines that it is appropriate for him to engage in unsupervised parenting time.

¶ 74    During her testimony, the GAL again expressed her reasons for her recommendation that Bethany be required to return with A.S. to Illinois. According to the GAL, Bethany had attempted to interfere with Robert's supervised visits and refused to facilitate a visit when Robert was in Texas for court. Robert was not given supervised parenting time for Christmas because the parties could not agree on the details. Bethany put a tracking device on A.S. in the form of a smartwatch for one of the supervised visits, which is against the rules of Precious Cargo, the company that supervises the visits. In addition, the GAL reported that Facetime rarely occurs for various reasons. The GAL opined that if A.S. remains in Texas, Robert will not have adequate parenting time.

¶ 75    The GAL continued to outline her reasons for recommending that Bethany be required to relocate to Illinois with A.S. Bethany's parents were residing, at least temporarily in Illinois. In addition A.S.'s therapist and Bethany's therapist are both in Illinois. The GAL testified that she was not aware of any familial support system that Bethany has in Texas, and voiced concern that A.S.'s attendance at preschool continued to be sporadic. Overall, the GAL opined that A.S.'s presence in Texas was limiting Robert's relationship with her, which is not in A.S.'s best interests.

¶ 76                              3. *Avril Sabharwal*

¶ 77    Avril Sabharwal, the director of A.S.'s preschool in Texas, testified via Skype by the agreement of the parties. Ms. Sabharwal authenticated A.S.'s attendance records for September 1, 2019, until March 2, 2020. She testified A.S. is happy coming to and leaving school, and that Bethany participates in school activities with A.S.

¶ 78                             4. *Tammy Berg-Neumann*

¶ 79    Tammy Berg-Neumann, the owner of Precious Cargo, was recalled to testify regarding parenting time she supervised for Robert and A.S. in January and February of 2020. She testified that during the January 14 and 15, 2020, visit, A.S. had separation anxiety when she had to leave Robert. She and Robert had a hard time getting A.S. into Ms. Berg-Neumann's vehicle so that she could take A.S. back to Bethany. After Ms. Berg-Neumann transported A.S. to the place where she was supposed to meet Bethany, A.S. refused to get out of the vehicle, and once she could get her out of the vehicle, Bethany would not come out of her car to take A.S. because Robert's truck was parked nearby, although he was not present. Bethany told Ms. Berg-Neumann she could not come out because of an order of protection. Bethany asked Ms. Berg-Neumann to bring A.S. to her, but Ms. Berg-Neumann did not want to grab A.S. A.S. was crying and kissing Robert's truck, refusing to go to Bethany's car, while Bethany was videotaping what was happening. Bethany threatened to call the police and Ms. Berg-Neumann told her to go ahead, and Bethany began to shout at her. Finally, Bethany got out of her vehicle and retrieved A.S.

¶ 80    On January 15, 2020, Bethany said she would be in the Union Station area after they met to exchange A.S. Once Ms. Berg-Neumann met Robert with A.S., A.S. said she would like to go to the aquarium. Ms. Berg-Neumann texted Bethany to tell her where they were going, and Bethany told them she was at the aquarium and would let them know when she was leaving so

they could head over. Robert got upset and texted the GAL. They ended up going to the zoo instead.

¶ 81 Ms. Berg-Neumann testified that A.S. had been displaying some abnormal behaviors during the visits, clinging to Robert and refusing to get off his shoulders when he was pain. A.S. was unruly for Ms. Berg-Neumann when Robert went to the bathroom. Ms. Berg-Neumann testified that she supervised a visit on February 15, 2020, as well and there were no issues on that visit except A.S. did exhibit separation anxiety when leaving Robert. Finally, Ms. Berg-Neumann described an incident where A.S. had a smartwatch on at the Sunday visit before, which is a violation of Precious Cargo's policy because it can be used to track the child during the visit.

¶ 82                                5. *Dustin Brugemann*

¶ 83 Dustin Brugemann testified he is a police officer and a close friend of Bethany's. He testified he has posttraumatic stress disorder (PTSD). He appeared at a recent exchange of A.S. to keep Bethany calm. He stood off to a distance to make Bethany feel safe.

¶ 84                                6. *Robert Stock*

¶ 85 Robert testified regarding the circumstances surrounding his Texas arrest. He testified that Heath Herndon asked him to come to Texas to testify on his behalf. He was arrested as he was sitting outside the courtroom waiting to testify. Robert contended that he did not even know Bethany was at the courthouse that day. He is on probation in Clinton County because of his guilty plea to misdemeanor bond violation.

¶ 86 Robert described his relationship with A.S. as "the daddy and A[.S.] show." During the marriage, Robert worked full-time, but A.S. would have to be distracted for him to leave because A.S. always wanted to be where he was. Robert described the end of his relationship with Bethany. Robert read several text messages between the parties from the beginning of the separation. He

25

then described in detail how they met and what their early relationship was like. Robert explained that Bethany moved from New York City to Mascoutah to start their relationship. Bethany worked two interior design jobs before giving birth to A.S. The circuit court had to interrupt Robert several times to ask him to limit his answers to the questions that were being asked and to ask Robert's lawyer to ask a different question due the rambling nature of his testimony.

¶ 87    Robert recounted an incident at the beginning of the separation when Bethany told him he could come visit A.S. the day after her birthday if he would take the dog to the vet. Robert read a host of text messages between the parties arguing about issues surrounding parenting time and decision-making for A.S. He testified that he became aware that Bethany moved to Texas with A.S. in April of 2018. He testified that he objects to A.S. living in Texas because it does not allow him adequate time with A.S.

¶ 88    Robert testified that it would be best if he had the majority of parenting time with A.S. because A.S. has regressed with learning. Robert expressed concern that A.S. is not getting the proper education or proper home life with a positive environment, outdoor, recreational time with horses, animals, and a backyard. Robert testified that if A.S. were in Illinois, he would be able to trust that she is being properly taken care of. Although he barely gets to see A.S., they have a very close relationship and are very affectionate. Facetime visits are sporadic and there are constant interferences.

¶ 89    Robert testified that, during his supervised parenting time, A.S. has been going to a horse rescue center with him. He then started talking about the Equine Therapy Center he started volunteering at and all the programming there until the circuit court intervened because he was not responding to the question about what he and A.S. do on their visits. After being redirected, Robert

26

testified that he has taken A.S. to Grant's Farm in St. Louis. They play on the iPad, color, sing, and play with Play-Doh together.

¶ 90    The circuit court adjourned proceedings until the following day when Robert would resume his testimony. The circuit court ordered supervised parenting time for Robert that evening from 5 p.m. to 8 p.m.

¶ 91                                F. Bench Trial—March 10, 2020

¶ 92                                    1. *Robert Stock*

¶ 93    Direct examination of Robert recommenced on March 10, 2020. Robert read text message exchanges between himself and Bethany where they argued about details regarding Facetime and where Bethany attempted to interfere in his relationship with Ms. Dimicelli. He read several others outlining communication on several different matters involving A.S. Robert testified he never abused Bethany although they did have disagreements. When Robert began talking about his football career in response to a question about a time Bethany punched him, the circuit court again admonished him to "stop rambling" and to answer the question. Robert relayed several instances where Bethany lost her temper during their relationship and behaved erratically. During this part of the proceedings, Bethany interrupted the testimony and was also admonished by the circuit court.

¶ 94    Robert explained his version of the visit that was supervised by William Massman wherein Mr. Massman felt threatened by Robert. Robert testified that prior to that day, he had voiced his concerns to Mr. Massman that "he was being used as a puppet by Bethany." Robert explained that Robert was on his knees and put his hand out and shook it back and forth like a puppet. He stayed on his knees so it could not be considered a threat. He did not physically threaten Mr. Massman but did verbally make Mr. Massman "aware that he put a child in a position that was harmful to

27

her overall wellbeing and that [Mr. Massman] needed to not come around anymore and be part of our visitations."

¶ 95    Robert testified that he had made various Facebook posts that people found threatening and that these were instances where he was just saying something "stupid." His equine therapy has greatly helped him "cope with instances of wanting to say something stupid." He testified that equine therapy gives him a place to think calmly and distract himself. Responding to leading questions from his attorney, Robert acknowledged that his interaction with the St. Clair County sheriff's deputies when he had refused to return A.S. from a visit "probably wasn't the best course of action to take at the time." He testified that in the future he intends to abide by any court order put in place.

¶ 96    Robert became emotional on the stand, explaining that he was crying "because I mourn the loss of my child as a woman would." He outlined concerns for A.S. living in Texas, also by responding in the affirmative to leading questions. He testified that he believed there was another male living with Bethany and A.S. He also testified he was concerned because he discovered A.S. has a cavity and a chipped molar. When asked if there was anything further, he wanted to tell the court, Robert stated, "I'm sorry for anything that has ever been said negatively about this process. I know everyone is here to do a job and I'm sorry."

¶ 97    On cross-examination, Robert testified that he was not present at the bench trial on November 19, 2019, because of "PTSD from domestic violence." He testified that Dr. Benelli at Gateway Regional Hospital in Granite City had made this diagnosis. He treats for his PTSD by engaging in equine therapy, but no records are generated in conjunction with this treatment. He had a disagreement with his then fiancée, Kim Dimicelli, the night of November 18, 2019, "from reliving the events discussed that day" in court. Robert denied that the disagreement turned

28

physical and testified that he left Kim's house at 5 a.m. on November 19, 2019, with the intent of appearing at the bench trial. However, when he went to his house, he could not leave because, in his words, "my home is my safe place."

¶ 98    Robert testified he cut off the ankle monitor that Texas authorities placed on him when he was released on bond because he thought Bethany would use it to kill him. Heath Herndon told him Bethany was trying to kill him, so he reported it to the FBI. Robert testified that a man named Gary Thomas attempted to interfere with his relationship with Ms. Dimicelli and, given his PTSD and triggers from previous incidents, he was unsure if Ms. Dimicelli was having an affair with Mr. Thomas. He was asked to read threatening Facebook messages that he sent to Mr. Thomas wherein he used racial slurs toward Mr. Thomas and threatened to "skin [him] out like a buck taken in rut," and threatened to cut his throat in his sleep and "go home and sleep perfectly fine."

¶ 99                    2. *Margo Sutter*

¶ 100   Margo Sutter testified that she is the founder of Equus Rescue and Therapy in Millstadt. Robert began volunteering with Equus and was there practically daily for the past two years helping with the programs there. She has had several occasions to witness Robert interact with A.S. when Robert has brought her to the stables to visit her little pony there. She testified that A.S. is always joyful while there. Ms. Sutter testified she has never seen anything to cause her to be concerned about Robert in his interactions with A.S. or in Robert's temperament in general.

¶ 101                   3. *Kimberly Dimicelli*

¶ 102   Kimberly Dimicelli testified that she had dated Robert for three years but, at the time of her testimony, they were only friends. She testified Robert is a very attentive father, and he always tries to calm A.S. and encourage her to go back to Bethany at the end of his parenting time. Ms. Dimicelli testified that Robert was never abusive toward her. Eric Johnson abused her during her

29

marriage to him. She consented to the order of protection that Eric Johnson had against Robert on behalf of her children as part of her settlement in her family case. However, she testified that the order of protection was based on false allegations. On cross-examination, Ms. Dimicelli testified that Robert had accused her of poisoning him with formaldehyde when high levels were found in his home and it had to be condemned.

¶ 103                                   4. *Rick Fagan*

¶ 104   Rick Fagan testified that he is a licensed professional counselor and has been Bethany's counselor since 2017. Mr. Fagan testified that Bethany has situational anxiety caused by trauma from her past relationship with Robert. She has engaged in cognitive behavioral therapy to manage her fight or flight response to specific triggers. He does not have any concerns that Bethany has anger issues. He is concerned for Bethany's mental health if she is required to move back to Illinois.

¶ 105                               G. Interim Proceedings

¶ 106   Following Ms. Dimicelli's testimony, the circuit court adjourned the bench trial and continued the case to May 7, 2020. The circuit court ordered supervised parenting time for Robert on the weekend of April 3, 2020. The circuit court ordered Robert to pay for Bethany and A.S. to fly to Illinois and that Robert would have supervised parenting time on Saturday April 4, 2020, and Sunday April 5, 2020, from 10 a.m. to 6 p.m. The circuit court also ordered that Bethany bring A.S. to Illinois for the bench trial dates in May so that Robert could have supervised parenting time from 10 a.m. to 6 p.m. on Friday May 8, 2020, and Saturday May 9, 2020.

¶ 107   The circuit court ordered the exchanges to take place at McDonald's in New Baden with supervision by Precious Cargo. The circuit court denied Bethany's request to have a second visitation supervisor of her choice. The circuit court ordered the parties to come up with a list of

areas that Bethany should avoid during the parenting time so that she would not be present in any public areas where Robert may be with A.S.

¶ 108   During a conference call on March 31, 2020, the circuit court cancelled Robert's April parenting time over Robert's objection due to the COVID-19 pandemic and the travel that would be required on the part of Bethany and A.S. The circuit court ordered that if Robert traveled to Texas, he would be allowed the supervised parenting time. The May bench trial dates and Robert's May parenting time remained set. At Robert's request, the circuit court ordered that Bethany allow a visitation supervisor to observe the Facetime calls between Robert and A.S. The circuit court specified that Bethany shall allow the visitation supervisor to join the call, but that Bethany shall not join A.S.'s counselor or any other people on the Facetime calls.

¶ 109   On May 4, 2020, the circuit court denied Bethany's motion to continue the bench trial. The circuit court ordered that all parties may be present for the May 7, 2020, bench trial via Zoom, but ordered that Bethany must still travel to Illinois with A.S. so that Robert could have his supervised parenting time as previously set.

¶ 110                               H. Bench Trial—May 7, 2020

¶ 111                                     1. *Gary Thomas*

¶ 112   Due to the COVID-19 pandemic, Gary Thomas's testimony was audio only, via Zoom. Mr. Thomas testified about the threatening Facebook messages from Robert. He got an emergency order of protection against Robert but did not follow up to get the plenary order of protection. After his altercation with Robert, Mr. Thomas reached out to Bethany on Facebook and they eventually met in person.

¶ 113                                    2. *Heath Herndon*

¶ 114   Heath Herndon also testified by audio only, via Zoom. He testified that he owns a ranch in Texas. He testified that at the time of his prior testimony, he had just been released from prison. Mr. Herndon testified that Robert contacted him and asked for him to obtain damaging information from Bethany and gave him a computer to use for that purpose. When asked to clarify his prior testimony that Bethany had been "heavy-handed" with A.S., he stated that she was not abusive "by any stretch."

¶ 115                                    3. *Eric Johnson*

¶ 116   Eric Johnson testified, via Zoom audio, regarding text messages he had received from Robert between November of 2019 and May of 2020. These including texts disparaging Ms. Dimicelli and Bethany, using a racial slur against Mr. Johnson, and accusing Mr. Johnson of being a drug dealer. Mr. Johnson testified that he obtained an emergency order of protection on behalf of himself prohibiting Robert from contacting him two weeks prior to his testimony. A plenary hearing was set for June 1, 2020. Mr. Johnson also claimed Robert texted to him that he thought "the feds" were reading all his communications. In addition, Robert stated in a text:

> "That deal in Texas was set up through some congressional folks I know because they thought I was going to off the judge in my divorce case because he let my daughter stay in Texas and she's been physically abused and sexually molested."

¶ 117                                    4. *Michael Shrout*

¶ 118   Michael Shrout testified via telephone due to technical difficulties with Zoom. He testified he is a carpenter who worked on Robert's house in December of 2019. On December 19, 2019, Robert's five dogs got out of the basement while Mr. Shrout was working, so he called his boss to let him know. When he got back from lunch, Robert pulled into the driveway and jumped out of

the car screaming at him to get off his property. Robert then ran up to Mr. Shrout and hit him in the rib, knocking him down. Robert then jumped on Mr. Shrout's back and punched him in the back of the head. Mr. Shrout testified that he was still receiving treatment for his neck at the time of his testimony. The circuit court took judicial notice of a misdemeanor assault charge that had been filed against Robert because of the December 19, 2019, incident.

¶ 119                           5. *Julie Weber*

¶ 120   Julie Weber, who is A.S.'s counselor, testified, via Zoom, that her opinion as to A.S.'s best interests differs from that of the GAL. According to Ms. Weber, A.S. has stability and routine in Texas, and that should not be disturbed. Ms. Weber recommended that Bethany and A.S. remain in Texas, with Robert having monthly, supervised parenting time. Ms. Weber testified that A.S. has a lot of anxiety about not knowing what to expect during her visits with Robert and gets upset when Robert disparages Bethany in front of her. She also expressed concerns that Robert is gaslighting A.S. into believing that she has been abused.

¶ 121                          6. *Dr. Robert Clipper*

¶ 122   Dr. Clipper testified, via Zoom, that he is a licensed clinical counselor and marriage and family therapist. He has been in practice since 1977 and was appointed to do a custody evaluation in this case. He was cross-examined regarding his reports, which were admitted into evidence at the very beginning of the bench trial. Further, Dr. Clipper opined that equine therapy will be insufficient to address Robert's patterns of behaviors.

¶ 123                           7. *Bethany Stock*

¶ 124   Bethany testified in detail concerning every day that A.S. had missed preschool, indicating whether there was an illness, they were traveling to Illinois, or A.S. was exhausted from traveling. She read several inappropriate text messages she received from Robert on the "Our Family

33

Wizard" application. She testified as to problems that occurred during Facetime visits between Robert and A.S. but testified that A.S. is starting to enjoy the Facetime visits more as she gets older. Bethany testified that Robert had been unavailable for the previous two Facetime visits. Bethany also testified that Robert had attempted to plan in April of 2020 to visit Texas and have supervised parenting time with A.S. in a safe location with minimal risk of transmission of the COVID-19 virus. Bethany testified that she did not respond because she checked with Robert's probation officer and was told that Robert was not allowed to travel to Texas.

¶ 125                                      I. Bench Trial—May 8, 2020

¶ 126                                      1. *John Gusso*

¶ 127   John Gusso testified, via Zoom, that he is Robert's defense attorney in Texas. He testified there was no active warrant for Robert's arrest in Texas and that the criminal case in Texas had been resolved.

¶ 128                                      2. *Kimberly Dimicelli*

¶ 129   Ms. Dimicelli was recalled to testify, via Zoom. She testified she was present in the car with Robert and A.S. around Christmas of 2018, when Robert made a video of A.S. in the backseat talking about fearing Bethany. Ms. Dimicelli testified that Robert did not coach A.S. as to what to say on the video. Ms. Dimicelli testified that Robert asks A.S. if something is wrong if she seems sad. Ms. Dimicelli described the incidents which first made Robert suspicious that A.S. was being abused:

> "I was giving her a bath really quick and she had turned sideways in the bathtub and put her head up against the wall and crossed her legs Indian style and put her legs up on the side of the tub closest to me exposing her parts. I told her, I said we don't sit like that. Little girls don't show their private part. And it just—it really concerned me as to why she was

34

doing that. And I noticed she was doing it in November as well when I would bathe her. She took—she started touching herself with the toy which made me very uncomfortable. So I told her let's turn this way and wash your hair. I'm trying to redirect her to get her to, you know, stop exposing herself, number one. And it made me uncomfortable with her taking the toy and touching herself."

¶ 130    Additionally, Ms. Dimicelli explained:

"A[.S.] has just been potty trained like a couple of months prior and she isn't real good at wiping herself but she wants to wipe herself. So she pat dries and unfortunately that's going to cause moisture down there throughout the day and starts to turn red. So before the day would start, I asked her if she wanted to put medicine on herself and she immediately looked to the floor and shook her head no. *** She starts crying, shook her head looking down and she said I don't want to. And I said well, I'm not going to do it, you know. *** No one else should ever touch your private parts, only you, and tried to explain that part of it. She ran over to Rob[ert] and jumped on his lap saying I don't want to. I had an owee down there before and mommy put medicine on me before. Rob[ert] asked how did you get an owee. And she put her head on his shoulder and started crying. And he then said you don't want to talk about the bad stuff and she said no I don't want to talk about the bad stuff."

¶ 131                                     3. *Robert Stock*

¶ 132    Robert was recalled to testify as to his version of the problems that the parties had been having regarding Facetime communication. Robert testified that the parties agreed to an unscheduled Facetime breakfast visit on April 1, 2020, but when the time came for the visit, Bethany refused.

35

¶ 133                                    4. *Tammy Berg-Neumann*

¶ 134   Ms. Berg-Neumann was recalled to testify that during a Facetime visit on March 31, 2020, A.S. invited Robert to have breakfast with her, asking Robert if he could Facetime her the next morning for breakfast. However, the next day, when she tried to initiate the Facetime call, Bethany did not accept the invite. Ms. Berg-Neumann could not recall whether Bethany agreed to the breakfast visit. She testified that when she tried to add Robert to a scheduled Facetime call on May 3, 2020 and May 5, 2020, "it did not connect." She does not know why it did not connect. Ms. Berg-Neumann testified that she suggested using Zoom for the visits, but Bethany refused because she does not think it is secure.

¶ 135                                    5. *Christy Foster*

¶ 136   Christy Foster testified that she is Robert's probation officer. Ms. Foster testified that she has never spoken to Bethany.

¶ 137                           6. *GAL Supplemental Report and Testimony*

¶ 138   The GAL's supplemental report, dated May 8, 2020, was admitted into evidence and the GAL testified in accordance therewith. In this supplemental report the GAL made recommendations regarding Robert's Facetime with A.S. but did not alter her previous recommendations.

¶ 139                                    J. Judgment

¶ 140   Following the last day of the bench trial, the circuit court took the issues of parental responsibilities and decision-making under advisement. On June 10, 2020, the circuit court entered a judgment order finding that because no parenting plan was in place at the time that Bethany relocated to Texas, section 609.2 of the Act (750 ILCS 5/609.2 (West 2018)) did not apply, and the issue of Bethany's residence would be decided by necessity based on a best interests analysis

36

regarding the parties' parenting time. After setting forth in detail its analysis of all 17 factors listed in section 602.7 of the Act (*id.* § 602.7), the circuit court found that, although it had concerns about the behavior of both parties, it is in A.S.'s best interests that Bethany be awarded the majority of parenting time with A.S.

¶ 141   The circuit court declined to order Bethany to return to Illinois, although it acknowledged that "had the court determined that Rob[ert] should have a more frequent parenting schedule, Beth[any] would have been realistically required to return to Illinois." The circuit court noted that it was Robert's instability that had led to the delay of trial in this matter, and in his doing so "Beth[any] remained in Texas and built a more stable, but by no means idyllic, life for A[.S.]." The circuit court ordered that Robert have supervised parenting time with A.S. pursuant to section 603.10 of the Act (*id.* § 603.10) until further order of the court, and the circuit court retained jurisdiction to review the ongoing need for supervision. The circuit court specified that it is unlikely to discontinue supervision of Robert's parenting time "until he undergoes cognitive behavioral therapy for a consistent period of at least six months with proof of progress as recommended by Dr. Clipper." The circuit court recommended that Bethany find a counselor in Texas and engage in cognitive behavioral therapy as well.

¶ 142   The circuit court ordered supervised parenting time in Illinois every other month, with travel expenses to be borne by Bethany and the cost of supervision to be borne by Robert. The circuit court ordered the next visit to occur prior to the hearing on financial issues that was to take place on June 29, 2020. The circuit court ordered that the times for the first six months be worked out by the parties at that hearing as well.

¶ 143   The circuit court ordered that, additionally, Robert shall be allowed to have supervised parenting time with A.S. if he travels to Texas:

37

"This court finds that Rob[ert] earns nearly $200,000 per year from his father's trucking business. Rob[ert] does not provide any work to earn said income. Rob[ert] can clearly afford to travel to Texas several times per year to visit A[.S.] For a Texas parenting time to occur, Rob[ert] shall notify Beth[any] at least 7 days prior to the requested date. Beth[any] shall not deny such parenting time without court authorization. [The] court will exercise its contempt authority if Beth[any] fails to comply."

¶ 144 Regarding parental decision-making, the circuit court analyzed the factors set forth in section 602.5 of the Act (750 ILCS 5/602.5 (West 2018)). The circuit court found the parties were not able to engage in joint decision-making. "For many of the same reasons Beth[any] is awarded the majority of parenting time," the circuit court found it to be in A.S.'s best interests that Bethany have sole decision-making authority as to medical, educational, and extracurricular issues. The circuit court ordered that religious decision-making be shared by the parties, with the parent exercising parenting time making decisions on religious training during that time. The circuit court ordered Bethany to notify Robert of any medical, dental, vision, counseling, or related services A.S. receives within 24 hours of said service. Robert shall be advised of the providers' contact information and shall have full access to A.S.'s records other than Bethany's address. The circuit court also ordered Bethany to make sure Robert has full access to A.S.'s activities and schedules and notify Robert of any change of schools within 48 hours. The circuit court ordered as follows:

"If Rob[ert] is in Texas, he may attend said activities and not be in violation of the current St. Clair County order of protection as this court believes that order gives this court discretion in such matters. The court is hopeful that in the future Robert will be able to progress to unsupervised parenting time for extended periods of time over the summer and holidays. When that is the case, Rob[ert] may enroll A[.S.] in such activities that may be

38

available during the period of his parenting time. Obviously, Rob[ert] may now engage in any regular leisure activities while he is exercising parenting time with A[.S.]"

¶ 145 As for miscellaneous provisions, the circuit court ordered that all communications between the parties shall occur via the "Our Family Wizard" application, and that both parties access the application at least daily to check for communications. Neither party shall disparage the other in front of A.S. or on any form of social media, and neither party shall discuss this case with A.S. at any time. If any party is to be more than 15 minutes late for picking up or returning A.S., that party shall contact the other immediately via "Our Family Wizard." Bethany shall notify Robert if she changes addresses within 48 hours without providing the specific address, and the specific address shall be provided to the circuit court within 48 hours and shall remain under seal until further order of the circuit court. Finally, no smartwatch or other device shall be placed on A.S. to track her while Robert is exercising his parenting time without court approval.

¶ 146 On June 17, 2020, Robert filed a notice of appeal from the circuit court's judgment.

¶ 147                                    II. ANALYSIS

¶ 148                    A. Applicability of Section 609.2(g) of the Act

¶ 149 The first issue Robert raises on appeal is whether the circuit court erred in not applying the factors set forth in section 609.2(g) of the Act (750 ILCS 5/609.2(g) (West 2018)) to evaluate Bethany's relocation to Texas with A.S.[1] Our supreme court recently set forth our standard of review for issues of statutory interpretation as follows:

---

[1]In his brief, Robert calls on this court to determine whether section 609.2 of the Act (750 ILCS 5/609.2 (West 2018)) applies at all to relocation issues prior to trial. However, we decline to do so because it is not necessary to our disposition on appeal. Whether or not Bethany was required to follow the procedures set forth in section 609.2(d) and (e) of the Act (*id.* § 609.2(d), (e)), the circuit court took her failure to do so into consideration as required by the Act. See *id.* § 609.2(d). It also noted Robert's objection to the relocation and detailed its reasoning for letting Bethany remain in Texas despite these factors, which was tantamount to granting Bethany's petition to relocate. See *id.* § 609.2(e).

"The standard of review for questions of statutory interpretation is *de novo*. [Citation.] The primary objective of our analysis is to ascertain and give effect to the legislative intent. [Citation.] The most reliable indicator of the legislature's intent is the statutory language itself, given its plain and ordinary meaning. [Citation.] 'It is a basic rule of statutory construction that the words of a statute should be given their plain, ordinary[,] and accepted meaning, unless to do so would defeat the legislative intent.' *Peoria Savings & Loan Ass'n v. Jefferson Trust & Savings Bank of Peoria*, 81 Ill. 2d 461, 468 (1980). We do not depart from the plain language of the statute by reading into it exceptions, limitations, or conditions that conflict with the expressed intent. [Citation.]" *Accettura v. Vacationland, Inc.*, 2019 IL 124285, ¶ 11.

¶ 150    The circuit court found that section 609.2(g) of the Act (750 ILCS 5/609.2 (West 2018)) did not apply to its initial determination regarding the allocation of the parental responsibilities of the parties in this case because that section only applies if there is a parenting plan or allocation judgment in place. We agree. Section 609.2(g) of the Act (*id.*), by its plain language, lists the factors that a circuit court must consider when modifying an existing parenting plan or allocation judgment based on the relocation of a parent. Here, the circuit court was making its initial allocation judgment, and as such, was required to evaluate A.S.'s best interests pursuant to the factors set forth in section 602.5 and 602.7 of the Act (*id.* §§ 602.5, 602.7).

¶ 151    Of course, the fact that the circuit court, in making its initial allocation judgment, was governed by sections 602.5 and 602.7 of the Act does not make those factors irrelevant to the analysis of what is in the best interests of A.S. As this court explained in *In re Marriage of Adams*, 2017 IL App (3d) 170472, ¶ 21, the factors in 609.2(g) of the Act are not additional factors, but in fact overlap with the factors in sections 602.5 and 602.7 of the Act. Bethany's behavior in

relocating to Texas without giving notice or seeking leave of court would necessarily be taken into consideration in making a best interests determination pursuant to sections 602.5 and 602.7 of the Act. Bethany's relocation and the attendant circumstances of that relocation are relevant to several of the factors located within those sections. These include the distance between the parents' residences, the cost and difficulty of transporting the child (750 ILCS 5/602.7(b)(9) (West 2018)), as well as the willingness and ability of Bethany to place the needs of A.S. before her own needs (*id.* § 602.7(b)(12)), and her willingness to facilitate and encourage a close and continuing relationship between Robert and A.S. (*id.* §§ 602.5(c)(11), 602.7(b)(13)). However, the circuit court's failure to specifically evaluate the relocation factors set forth in section 609.2(g) of the Act (*id.* § 609.2(g)), when making its initial allocation determination, does not constitute legal error under the plain language of that section. To hold otherwise would be to write a requirement into the Act that is simply not there.

¶ 152                               B. Propriety of Allocation Judgment

¶ 153   Having determined that the circuit court did not err in failing to specifically evaluate the relocation factors set forth in 609.2(g) of the Act (750 ILCS 5/609.2(g) (West 2018)), we turn to the substance of the circuit court's allocation judgment. The circuit court's decision with respect to the allocation of parenting time and decision-making must be based on the best interests of the child. *Id.* §§ 602.5(a), 602.7(a). "A trial court's determination of what is in the best interests of the child should not be reversed unless it is clearly against the manifest weight of the evidence and it appears that a manifest injustice has occurred." *In re Marriage of Eckert*, 119 Ill. 2d 316, 328 (1988). "The trial court is in the best position to judge the credibility of the witnesses and determine the best interests of the child." *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 24. "Where the evidence permits multiple inferences, we will accept those inferences that support the trial court's

41

order." *Id.* "Under the manifest weight standard, an appellate court will affirm the trial court's ruling if there is any basis in the record to support the trial court's findings." *Id.*

¶ 154   On appeal, Robert argues that the circuit court's allocation judgment is against the manifest weight of the evidence because the circuit court did not follow the recommendation of the GAL that Bethany be required to move back to Illinois so that A.S. could have frequent contact with Robert. However, the circuit court is not required to follow the recommendations of the GAL. Section 506(a-5) of the Act (750 ILCS 5/506(a-5) (West 2018)) makes clear that the appointment of a GAL is not to abrogate the decision-making power of the trier of fact and should not serve to place such individual in the role of a surrogate judge. The circuit court explained its decision to depart from the recommendations of the GAL in detail:

> "The court is well aware that this ruling fails to follow the ultimate recommendations of the GAL[.] [H]owever, the court agrees with most of the GAL's statements regarding the parents. GAL Rosemary Berkemann filed a fully detailed report in 2018. She has since updated the report and has testified in this proceeding. Her recommendation of frequent parenting time for Rob[ert] has not changed[.] [H]owever, she does believe that Rob[ert]'s parenting time should be supervised and that he should seek the recommended counseling before that supervision is lifted. This recommendation for Rob[ert] to have more frequent parenting time would, by necessity, require Beth[any] to return to Illinois.
>
> In every prior case in which this court has presided, this court has largely agreed with the GAL's recommendations. In this case, however, the court has no confidence that Rob[ert] will follow up on any of Dr. Clipper's recommendations or follow the court's orders. Rob[ert] has demonstrated that he does not believe he has a problem and sees

42

himself as a victim in many aspects of his life. He has shown an inability to conform his conduct to the requirements of the law as evidenced by multiple orders of protection against him and the attack upon Mr. Shrout. His mental health, if anything, has deteriorated since this trial began in November 2019. The court is not punishing him for having mental health issues[.] [H]owever, the court is concerned that his continuous failure to seek treatment for said issues is placing the public in danger. The court, therefore, must find that A[.S.] is also likely to be in danger if he continues to ignore Dr. Clipper's recommendations. Uprooting A[.S.] from her home in Texas in hopes of Rob[ert] changing his behavior, when he has shown no interest in doing so, is not in her best interest."

¶ 155    In his brief on appeal, Robert does not engage in an analysis of the factors set forth in sections 602.5 and 602.7 of the Act (750 ILCS 5/602.5, 602.7 (West 2018)) in an attempt to explain how the circuit court's detailed analysis of these factors was against the manifest weight of the evidence. Accordingly, it may be said that he has forfeited this court's consideration of any such arguments. See Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) ("Points not argued are forfeited"). Nevertheless, this court has engaged in a detailed review of the record, as set forth above, and finds that there is ample evidence in the record to support the circuit court's analysis as to each factor and its ultimate determination as to the allocation of parenting time and decision-making responsibilities.

¶ 156    The circuit court made clear that, absent Robert's erratic behavior throughout these proceedings, Bethany would have been required to move back to Illinois. However, based on: (1) the amount of time Bethany has been in Texas with A.S.; (2) the circumstances surrounding the need to restrict Robert's parenting time pursuant to section 603.10 of the Act (750 ILCS 5/603.10 (West 2018)); and (3) the fact that Robert had not begun cognitive behavioral therapy to

43

address his behaviors as of the time of trial,[2] the circuit court declined to require Bethany to move back to Illinois. Whether this court would have made the same decision is irrelevant if the opposite result is not clearly apparent. See *In re Marriage of Lonvick*, 2013 IL App (2d) 120865, ¶ 33 (a judgment is against the manifest weight of the evidence when an opposite conclusion is clearly apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence). Accordingly, we decline to disturb the circuit court's judgment.

¶ 157                     C. Remaining Arguments on Appeal

¶ 158   Robert raises two other arguments on appeal. First, he argues that the circuit court abused its discretion when it considered Trista Dall's testimony as evidence of Robert's propensity for violence toward women after stating the following during Donald Hubert's testimony:

> "[Ms. Dall's] testimony is going to be given very little weight however the [c]ourt rules in this case. So ultimately it isn't going to matter. So I don't really care what she said or what this guy is going to say."

¶ 159   Assuming the circuit court erred, we agree with Bethany that Robert fails to illustrate to this court how the circuit court's consideration of Trista Dall's testimony constitutes reversible error. "Not every error committed by the trial court in a civil case leads to reversal." *Central Illinois Electrical Services, L.L.C. v. Slepian*, 358 Ill. App. 3d 545, 550 (2005). "If the outcome of the case would not have been different, a judgment or decree will not be disturbed." *Id.* "The burden is on the party seeking reversal to establish prejudice." *Id*. Here, the circuit court considered Ms. Dall's testimony as evidence of Robert's propensity for violence toward women. However, there is no indication that this evidence had any bearing on the circuit court's decision to allow Bethany to

---

[2]The circuit court acknowledged Robert's participation in equine therapy but found that it was insufficient to address Robert's behavioral issues. This is supported by Dr. Clipper's testimony.

remain in Texas, and there was ample evidence to support the circuit court's decision to restrict Robert's parenting time absent Ms. Dall's testimony. Accordingly, we find that the outcome of the case would not have been different had the circuit court completely ignored the testimony.

¶ 160 Finally, Robert argues that the circuit court failed to consider all the evidence at trial because it referenced only the evidence that favors Bethany in its judgment. This argument is belied by the record. In the judgment, the circuit court outlined its concerns regarding Bethany's mental health and behaviors, noting Dr. Clipper's opinion that she is immature and self-absorbed, and suffers from PTSD. The court specifically found that Bethany is not exceptionally stable and is prone to dramatics and poor decision-making. The circuit court noted the evidence that was presented that Bethany wanted to have Robert killed. Although the circuit court found that Bethany did likely make a comment in that regard, it declined to find she seriously intended to have Robert killed. However, the circuit court did find the statement as "just more evidence of [Bethany's] selfishness and inability to co-parent with Robert." Accordingly, we find Robert's final argument lacks merit.

¶ 161                                III. CONCLUSION

¶ 162 For the foregoing reasons, the circuit court's June 10, 2020, judgment allocating the parental responsibilities of Robert and Bethany as to their minor child, A.S., is affirmed.


¶ 163 Affirmed.